May it please the Court, good morning. I'm Robert Cantori. I'm the Attorney for the Respondent, Studio Transportation, Drivers, Teamsters Local 399. I would like to save five minutes for rebuttal. We're here, Your Honor, fighting over what is basically $30. That's basically what's at issue here. And the reason we're here is because the Respondent believes that the NLRB should not be interfering with its internal affairs. To begin with, we have Section – You kind of dropped your voice. Oh, I'm sorry, Your Honor. To begin with, we have Section 8A.3 of the Act, 29 U.S.C. 158A.3, which in the beginning outlawed the closed shop, but it did allow for the union shop. It allowed unions and employers to agree that 30 days after employment or 30 days after the execution of the contract, whichever is later, all members of the bargaining unit would have to become members of the union. Now, the Supreme Court in General Motors later explained that membership, as used in the statute, had to be whittled down to its financial core. That is, the union could not require actual membership in the union, but merely could require that the individual pay the uniformly required dues and initiation fees. Subsequently, in Beck, the Supreme Court said, Okay, you can charge them dues, and you can charge them for the cost of representation, but you can't charge them for your charitable contributions, your political donations, and your other charges unrelated to collective bargaining and representation. That we start with. Then we go to 8B.1, which specifically says that nothing in the Act and nothing the NLRB can do can interfere with the union's right to make its own rules with respect to the acquisition and retention of membership. Now, membership in the statute, remember, Your Honor, doesn't mean actual membership in the union. It merely means paying dues. So, the union here has made a rule which basically says its Beck objectors are going to pay the same amount for representation as its real members do. And the way it's going to do that is to take all the money it receives from studios, primarily, for violation of the contract to make its charitable donations. And as a result of that methodology, the intervener here did not pay one penny of the charitable donations that the local made, the political contributions that the local made, or any other non-chargeable expenditures. And that's all the law requires. The Board says it well in its brief. As this Court recognized, Beck left intact parameters of the union's responsibilities to the Board's discretion. Thus, the Board has held that a union violates Section 8B.1a of the Act if the methodology used to calculate an objector's dues is not reasonably designed to ensure that the objector pay only their fair share of the union's representational expenditures. Well, that's all he paid, his fair share of the representational expenditures. He hasn't paid a penny for charitable contributions. The Court Board went on to say, furthermore, no portion of the fees charged to the objector can be expended for non-representational activities. Well, they haven't. He got his discount for the amount that was paid for charity. So what is the Board doing here? It's telling us that we have to. We have to give him something we don't even give our members, a reduction in the chargeable amounts. We have to give him. We have to discriminate against our own members. No, what the Board's saying is that your method of calculation isn't reasonably designed so that he pays only his fair share of representational costs because you're taking liquidated damages and using it for political and charitable contributions. And if you put it back in the same account and allocated it fairly across the Board, then he would be paying less in dues. And the members, actual members, would be paying more in terms of their chargeable expenditures. Because they're paying for political and charitable contributions, which they've signed up to do. But they will be paying more for the chargeable expenditures as well, Your Honor, under that scenario. Because he will get a reduction in his chargeable expenditures. The membership will not. Therefore, he will be paying less for chargeable expenditures than the actual members would be. You just set up your account differently. I mean, I don't even understand why you've set up the account the way you did, except to be able to make these political and charitable contributions out of your liquidated damages. Well, Your Honor, that is something that the secretary-treasurer, which is the chief executive officer, go back to his members and say, members, none of your dues goes to charitable expenditures. It all comes out of the money we get from Warner Brothers, from Sony. In fact, I got a question for the Board. I asked it before the meeting. I didn't get an answer. Before the argument, I didn't get a hearing. I have a meeting with Sony tomorrow. We're settling about three grievances. I will probably get at least $20,000. If Sony pays that little, they'll be lucky. Now, there's about 4,000 members of Local 399. If Mr. Lim was still employed at Universal CityWalk, would I have to tell, and I wanted Sony to pay that money directly to a charity, would I have to take $5, roughly one four-thousandth of the amount, and send it directly to Mr. Lim? Why can't the local decide where it can't identify who its members are? I'm sorry, identify who its members are. It can't identify who among its members suffered the damage. Why can't it spend that money as it sees fit? Why can't it identify who suffered the damage? Because the way it is, Your Honor, not in Mr. Lim's bargaining unit, but in the motion picture industry where Mr. Lim is not employed. He's employed at CityWalk, or was employed at CityWalk. No driver, and it's primarily drivers, of the 2,500 members covered by what we affectionately call the black book, about 2,450 are drivers, work steady for any employer. A motion picture starts production today, hires about 50 drivers, and at the end of production, usually about 17, 18 weeks from now, those drivers will be laid off. Then it's a scurry for the next job. Under the contract, the employer must give preference of employment to people who have previously worked in the industry. An entity known as the Contract Services Administration Trust Fund maintains a roster of those people, keeps a record of those people, and if they hire off the roster, you know, the producer's brother-in-law, something like that, a grievance is filed. And I think we all missed our calling in life. You can make $20,000 on a single motion picture very easily. These guys are well paid, Your Honor. So who among the union's 2,500 members should the producer have hired? They have the right to hire anyone off the roster subject to certain seniority rules. But we cannot identify what we could have done is taken the $20,000 and divided it among the 2,500 members, and then Mr. Lynn definitely wouldn't have gotten any of that money, because he would never have had the opportunity to work in the industry because he never had before. Another thing I don't understand is why do you commingle the dues from the Hilltop CBA and the Alliance CBA? I'm sorry? Why do you commingle the dues in the first place? Because if you didn't commingle the dues, Mr. Lynn was a member of the Hilltop CBA, right? Right. Okay. Well, if you didn't commingle the dues with the Alliance CBA, you wouldn't even have this problem, would you? No, Your Honor. We would never have been able to negotiate the initial contract with Hilltop. Hilltop was only organized roughly five years ago. I did the initial organizing. I did the initial collective bargaining. How was the local going to pay for my fees if it didn't pay them out of the dues collected from members working in the motion picture industry? So a typical union will commingle the dues because you never know which bargaining unit is going to need the expenditure in that particular time. So I don't know of a single union that doesn't commingle the dues. But you can account for them separately, can't you, whether you commingle them or not? And again, Your Honor, we're now looking into how all these questions get right into what I think Section 8B1A says the courts shouldn't be doing. Frankly, that's also what the Supreme Court has said, micromanaging how the union accounts for its fees. All you have to look at is did he pay any portion of the charitable expenditures? When you answer that question with a no, the inquiry ends. But when you start siphoning off liquidated damages and sending them over to political and charitable activities, you are in effect keeping the representational expenses artificially high, aren't you, by not netting out the expenses by the appropriate reduction obtained from those liquidated damages. And isn't that all Mr. Lim is saying? You've got to account for them in the same ledger account. And by not doing that, I am paying more than my fair share of representational. I mean, I think that's the argument. I think it's the argument, too, Your Honor. And I get back to that's not what the fact of the matter is, we spend that much money on representational issues. My fees, the business agent's salaries, the rent on the offices, transportation, all these things go toward representational purposes. That amount of money is spent. Now, we get $20,000 from Sony. What should we do with that money? Mr. Lim says we have to put it in the general account and reduce chargeable expenditures. Well, why? Just so his amount of dues can go down? Why can't we give it over to a charity? Why can't we, in fact, take the money and divide it among the 2,500 people, of which Mr. Lim is not one, who could have possibly had a job in the industry? If we did that, he wouldn't have his dues reduced. There would be no reduction in the chargeable expenditures. There would be no reduction in the out-of-pocket money for the local. So what it really boils down to is the NLRB telling Local 399 how to spend its money, and that, we think, Your Honor, is not permitted under 8B1A. I think it says less about how you should spend it and more about how you should account for accounting purposes for just this kind of BECC purpose. I think that's all they're saying. I don't think they're directing the union to do anything differently with regard to their charitable or political activities or anything. I was surprised, frankly, that the charitable and political activities were relatively nominal sum. There are probably other unions where it's upside down the other way. This year I think they'll be a little bit higher, Your Honor. Let me ask you this. What if you have a situation where the union is seeking damages or a claim from the employer, and in this case you were successful? What if you fail? Who pays for that? The general membership, Your Honor. I don't bat a thousand. What? I don't bat a thousand. The general membership pays for that out of its own. Everybody pays. Everybody pays, Your Honor. And it comes out of where? The general treasury. General treasury. General account. So in this instance you win and you get this money, but it's a chore to figure out how that should be divided? Well, it is impossible to say, because all the contract requires is that the producers hire from this list of employees. It doesn't say who from the list. It just says you have to hire from the list. It's impossible to say who on the list would have been hired by the producers. So the local looks at that and says, okay, let's put the money into a charity. How do you find out when they've hired someone who isn't on the list? Spies. Little phone calls. People on the list might have been hired too for this. Oh, yes. There's usually 60, 70 drivers on a typical major motion picture feature, and I assure you, Your Honor, that there is somebody on there that we used to say in Brooklyn, drop a dime on the employer and let us know what's happening. And these calls come in all the time. Business agent will go out, sometimes fly out to New Mexico or someplace else where the producer is filming. Grab the call sheet for the day. Look down the call sheet and see a name he doesn't recognize and call it back to the hall, make sure that person is a union member and on the roster, and if either one of those is a problem, take care of it. And by union member, I mean paying dues. I'd like to save the rest of my time unless the Court has other questions of me at this time. Thank you, Your Honor. You wouldn't really know whether an agency fee employee would have actually been working on that job. Is that what you're saying? The hall would have that kind of information, Your Honor. Mr. Lim would not have been working on the job. If we found Mr. Lim working on the job, there would have been a grievance filed and we would have collected money because Mr. Lim was not on the roster. He had never worked in the industry before, and therefore, if he were working on the job, a grievance would have been filed. So Mr. Lim filed this grievance to the board, right? Yes, Your Honor. Complaining about $30 a year? Complaining about the way his dues were calculated. I mean, there wasn't a specific money amount alleged in the complaint. The issue in this case is an issue less of money and more of public rights. The board has said that you cannot calculate dues for objectors in a way that forces that objector to pay more than his fair share. And that's what the complaint was in this case. And the board found that this was the way the union's methodology was calculated was a violation of the union's duty of fair representation to objector Lim. How did he pay more than his fair share? By using the damages they collect through arbitration only to offset the non-representational costs. Those are the costs that only full union members pay. They effectively increased Mr. Lim's dues. They shifted the costs, the representational costs, so that he paid more than his proportionate share. Well, would he have been entitled to a portion of that settlement? No, Mr. Lim would not be entitled to a portion of the settlement, nor would any other member of the Hilltop Unit. These are arbitration expenses that are pooled across the two units. But no member of the Hilltop Unit, Mr. Lim's unit, could ever actually get any of those arbitration damages because they're not grievance in those arbitrations. The union has decided that it would, when it got liquidated damages, damages it couldn't award to a particular grievant, that it would give those liquidated damages only against its non-chargeable expenses, which reduces dues for full union members only. But no member of the Hilltop Unit could ever get any of those arbitration damages personally. So what's the answer to the question counsel posed that suppose he just, in his negotiations with Sony, directed Sony to give the money to the Barack or Clinton campaigns? The board, of course, did not address this question because it was not part of the charge. I'm asking you, what is the answer to that? Because it seems to me they can circumvent this whole issue if they want to. If this came before the board, I'm inclined to say that the board would find the charitable contributions to be a duty, a violation of the duty of fair representation. And the reason is because the Hilltop employees pay part of those arbitration expenses. And under California SAW and Chevron Chemical, you cannot charge an objector any dues for services, including arbitration, that will not ultimately inure to the benefit of that unit. And if the liquidated damages always go to charity and there's no chance that any of those dues will ultimately inure to the benefit of the Hilltop Unit, that's an improper use of the dues. It's an improper calculation. I believe that's what the board would say. Of course, the board has not taken that particular issue up. Then who pays for the arbitration and the cost of the lawyers that get together with the employer to get this rather small amount of money? It's my understanding that those costs are pooled across both units. So Mr. Lim and the other members of the Hilltop Unit also contribute dues to those costs for the arbitrations. Am I correct, though, that the argument principally that Mr. Lim is advancing here and that the board adopted or endorsed, was that if the two units are going to all participate in representational expenses, and those representational expenses are going to derive benefits in the form of liquidated damages, that in order to make sure that a Beck objector doesn't pay more than his or her fair share, those liquidated damages, at least for accounting purposes, have to be returned to the realm of representational expenses. And only by doing that calculus do you determine what the appropriate dues would be so that, consistent with Beck, Mr. Lim doesn't get a free ride for the union's efforts. I agree with your statement mostly. Okay. The correction I would make is that the board didn't, in its order, say that the liquidated damages have to be apportioned only to representational costs. Actually, what the board said was, don't even consider the offset of the liquidated damages. Calculate the percentage that Mr. Lim owes before you include that at all. So, not being a math major, if they apportion, they would have to apportion those liquidated damages across the board to chargeable and nonchargeable, I think, for the math to come out. But what the board is saying is that those liquidated damages should not be charged only to nonrepresentational expenses. Because by doing that, Mr. Lim's proportion of representational costs increased. And as far back as street, the Supreme Court has said, you cannot shift costs so that an objector is forced to pay more than his fair share of representational costs. The union has argued that Mr. Lim didn't pay any nonrepresentational costs. But the union's BEC obligations include the obligation to make sure he doesn't pay a disproportionate share of representational costs. They can make him pay his fair share, but their obligations include the responsibility to ensure he doesn't pay more than his fair share. And it's not just an issue of internal union affairs. I mean, BEC took the internal union of, took the calculation of dues and what can be charged to an objector out of the union's purview. They left the exact parameters of the union's obligation regarding chargeable expenses and expenses germane to collective bargaining to the board. And the board, yes, Your Honor? Is this an, this accounting method, is this a widespread practice among unions? Which part of the accounting method? Well, the way, where they offset the liquidated damages against one portion, well, the nonchargeable portion and not the chargeable portion. Is it widespread? I can't answer that with. I'm just wondering the magnitude. It seems to me like this is, the magnitude of this case, it's to me something that I'm not quite understanding why we're here in the Ninth Circuit Court of Appeals over this issue. Exactly, Your Honor. The only case that I came across that was similar was the Chevron chemical case, which was about investment income. It is true that unions pooled their expenses across units, but I'm not sure that this particular issue, the issue of the damage and how it's offset actually occurs very often. No, Your Honor. You couldn't work it out with the union? There were initial settlement discussions. I believe we had a settlement discussion, a brief one, right after we were assigned to the Ninth Circuit, but we were unable to settle. I mean, part of the problem with board orders where there's no money at issue, there's not a lot to settle. Either the board gives in on its view of the law or the other side gives in on its view of the law, and very often those kind of cases don't settle. I mean, the board here is arguing that this is a case of public rights. The way they've calculated Mr. Lim's dues is incorrect, and it's a violation of the duty of fair representation. For the board, it's not so much the money. I mean, the board's order is that they have to recalculate Mr. Lim's dues. That's the total of the order, other than posting a notice. Right. I just thought the NLRB had more important things to be doing than this. Yeah. So this settlement of court, this settlement, say, in the long run, do they inure to the benefit of all the employees, the union employees, the agency fee employees? The arbitration settlements? Yeah. Do they inure to the benefit of all the employees? Well, did they? No. I mean, the way the offset is calculated, they did not inure to the benefit of all the employees. They inured to the benefit only of full union members. I mean, that's the problem with the methodology and the problem with the calculation. Only the people who are full union members. How does it just inure to the benefit of union employees? Because the way the liquidated damages are calculated, the liquidated damages reduce the amount of non-chargeable expenses that full union members would pay, and it increases the amount of representational costs and increases the percentage that Mr. Lim would pay. What if the union just got that settlement and just put it in the bank? There's no problem with that. I mean, the issue is that the issue is what they did with the damages just to increase Mr. Lim's dues. Putting the damages in the bank is not the issue. They could, of course, put the damages in the bank. Well, how does that increase his dues? Because when they increased the proportionate share of representational expenses that he paid by subtracting the liquidated damages from non-chargeable expenses, full union members' dues went down slightly and Mr. Lim's, the proportion of representational costs, Mr. Lim's dues went up slightly. So how much did the union members' dues go down? Mr. Lim's dues were, under the union's methodology, 99.63 percent of full union dues, and under the board's methodology, 98.81 percent. So it's a very small difference. The exact dollar amounts I'm not entirely sure on, but the percentage difference is very small. With this particular... You know, among the first cases I ever, well, when I first got on the district court, I got maybe 175 cases that the judges in those days used to refer to as dogs, see. Now they have a more humane system of allocating work. No, not really. But, you know, among the first ones I had with this whole business of agency fees and I can't think hard enough. I can see the lawyers in front of me, but maybe if they had a sign or something, I could remember their names. But, you know, I'm going back down to 1967. How many years is that? Ten years? Ten years. He's not a math major. No, I'm a mathematical genius. No, not me, by a long shot. So you're saying I should be worried about my future at the board since they're assigning me dogs? Say that again. So you're telling me I should be worried about my future at the board because they're assigning me the dogs? No, no, no, no, no, no. The board is very kind. I'm talking about fellow district judges that are not kind. You know what I mean? So if that extra money that was awarded, if the union just put it in the bank, we wouldn't be here. I believe that's true, Your Honor.  Well, I'm just trying to think of something else, but it escapes me now. The union's back obligations say that they must ensure Mr. Lim pays only a fair share, and their calculation has increased his fair share of representational costs. The board found that to be a violation of the duty of fair representation to Objector Lim. And if there are no further questions, we ask that you enforce the board's order. All right. Your Honors, I'm John Scully, and I represent the intervener, Mr. Lim, who filed the charge and got this all going. I understand he's no longer, at least counsel said he was. I have no additional knowledge of that. All I know is that information. You have no additional knowledge? It's your client. I realize that, Your Honor. I haven't been able to get in touch with the client since discovering that in the union's brief. So maybe he's not even around anymore. Well, he's around somewhere, I assume. I haven't been able to track him down, no, Your Honor. Don't you have a phone book? I've tried several of them. Does it affect this case? No, Your Honor, it does not. It doesn't affect the case for two reasons. One, Your Honor, assuming he's around somewhere, and eventually we can track him down. You don't know that. You don't even know where your own client is. Assuming he's not dead. All we know is he's not in the black book. Assuming he's not dead, he would still be entitled to the breakdown from the year. He's not even working for the union anymore. That wouldn't make a difference because the breakdown that they gave him was from the time he was working there, and that affected the dues slash fees that he paid at that time. If we were to roll in the board's favor. Yes, Your Honor. Does Mr. Lim get some money? Once they recalculate it, yes, he would. And so what are you planning to do with that money? I'm not going to do anything. Well, I'm going to try to track down Mr. Lim. The board compliance people usually do the tracking down and get the money to them. The money doesn't go through me at all. I'll never see the money. Counsel, do you know where Mr. Lim is? The regional office would be charged with finding him. Well, the question is, do you know where he is? The regional office compliance officer usually has an address on file and they have access to all this. Well, so why didn't you give it to counsel before? So he could find his client. At this point, the board represents Mr. Lim. When the check is written from the union, the check would go to the board, not to Mr. Scott. And the regional office would be charged with finding him. So how are you going to get it to Mr. Lim? How will we get it to him? The regional office will use the last known address that it has on them and then they will try to find him through their databases. They will give the money to him. If they can't find him within a year, I think the money goes back to the union, but I'm not entirely sure what happens. And in addition, Your Honor, the principal that the board represents is still alive because this could affect other people that would enter that bargaining unit in addition to Mr. Lim if the union continues their policies as well as other employees across the country if other unions were to adopt this sort of offsetting procedure. If we don't have another party, do we have a live controversy? Yes, Your Honor. Mr. Lim is not the party.  I'm merely representing the intervener in the case. That's my understanding of how this is set up under the jurisdictional operations. So who pays your fee? I work for a foundation that pays my fee. Which one is that? The National Right to Work Foundation, Your Honor. Oh, yeah. They've been around a long time. Yes, Your Honor. Yeah. And I represent Mr. Lim on a pro bono basis. I mean, he doesn't pay anything to me. All right? All right. In any event, one of the questions that had arisen was whether this was a common... We don't even know if he's still interested in this case, do we? When I spoke with him... When did you speak with him last? It was before the briefs were filed in the case. I don't recall the exact time, Your Honor. He was interested. My view is that I have an obligation to represent the client unless the client discharges me. Otherwise, I might be in violation of my obligations if I was to walk away and then he was to pop up tomorrow and say, hey, how come you abandoned my case? Now, did he come to you or did he... Initially, yes, Your Honor. He came to you... Yes, Your Honor. ...complaining about this? Yes, Your Honor. How did he get to you? How did he get to me? I don't recall the exact way, but we have a website. We have a toll-free number. We have an Internet thing. Typically, we receive dozens of calls each day from potential clients, and those of them we feel have legitimate cases and can help out. We try to help out if possible. All right. So what do you want to add on Mr. Lim's behalf? I was going to... One thing I wanted to point out was the question that you had raised whether this was a common system used by unions. And while the cross-bargaining unit is extremely common, as the union pointed out, just about every union does it, it is fairly uncommon for unions to subsidize the... activities. In the years of myself doing this, I've only run across three or four cases. To my knowledge, other than this case, the only other board case is the Chevron case, which has been cited by the parties. The union raised the question of what should they do with this fund once it gets from the... once they get this from... in a fine. And the board is not telling them what to do with it. They're merely telling them what they can't do with it that would be unlawful. They could do a lot of things with it. Just coming to my mind would be they could reduce everyone's chargeable expenditures, their members and non-members. They could refund the $5 to non-members. They could end the cross... Don't they... I mean, isn't this a process that goes on where the union gets after whatever it is, the employer, on some sort of overall grievance and they get money? And there are other times when they work on it and they go down the tubes. They lose money. And you mean every time it goes back and forth and back and forth? Is that what you're saying? I don't know that I was addressing directly that point. I certainly recognize that it goes on constantly, but the money... Do they win all their claims? I would assume not, but the money being used to finance the grievances is being It's the system rather than the $30 or the $20 or the $100 that's the problem, because that amount could vary from year to year depending on how successful it is. Don't the non-members, if the union is successful, aren't there some benefits in the future? They certainly don't have the financial benefit that a member would receive because the member is having his non-chargeable expenditures eliminated while Mr. Lim or an agency fee payer has been forced to essentially subsidize the system that's allowed the charitable contributions to go on. What charitable contributions are you talking about? Well, the non-chargeable activities of the union, whether it's a contribution to a traditional charity, whether it's a contribution to a political campaign, it wouldn't matter. When the union takes the fines, my understanding is that what the union uses the fines for is to offset those non-chargeable activities, which are often, from what I understand the union is saying, charitable contributions or political activities. And what if the union's claim against the employer fails? If the union's claim against the employer fails, then there's no question as to having to put any money back into the general revenue account. There's no real issue then because we're not arguing that the agency fee payers, that Mr. Lim didn't have to pay for the arbitration, for his share of the arbitration to occur. It's just that the product of that then has to be shared by everyone, just as Mr. Lim has to pay his share of having that arbitration go forward. So if there's no success, there is no issue then. It's just when the union's successful and then takes that money to subsidize only its otherwise non-chargeable activities that the issue arises. If the union takes the money and puts it into its general fund, that's fine. Thank you, Your Honor. A couple of things, Your Honor. I've represented unions in New York and California for 33 years. I can tell you that very soon. Okay, it shows. I wish it did, Your Honor. But very few unions have this source of income because very few unions have this particular type of clause with the preference of employment and work on such a casual basis, 17 weeks laid off. That doesn't happen that often. But Mr. Lim received benefits from the union. When the union organized this employer, they had no employer-paid health care. And the employer health care that was being provided cost so much that only one member of the bargaining unit could afford it, and it wasn't Mr. Lim. They had no pension. And they were making between $14 and $19 an hour. In the first contract, we got those monies up to the minimum wage was $16 an hour. We got them health care. The best plan around? No. But the second time, we got the best plan around. Did we get them a pension? Yeah. Was it the best pension around? No. But the second contract, it improved. We're already into the third contract. It's even better. Mr. Lim, had he stayed there, would have gotten a benefit and should have paid for it, should have paid the union. But he did pay for that, right? Yes, Your Honor. And now they want him to pay less. And that's my point. That is my point. Mr. Lim received benefits from the union. He does not pay for the services of the union anymore. And I'm talking only the services of the union, not the charitable expenditures and things like that. For the services performed by the union, Mr. Lim did not pay one penny more than a full union member. The union members paid exactly what Mr. Lim was paying for the services. Where the union members, the full union members got a discount, and I'll admit they got a discount, was on the charitable expenditures. But the basic question is, did Mr. Lim pay any more than union members for the services he received? And the answer to that question is no, absolutely not. And what do they want now? They want him to pay less for those services. And we say that isn't fair. Now you're discriminating against the union members. Why can't we pay for the non-chargeable expenditures with this unique form of income that this union and very few other unions have? So this case doesn't even have any broad policy or political implications.  So you're saying this is really about $12.57 or whatever the number is? Right now it's not even about that. Because right now there is not a single Beck Objector in the local. It has a 100 percent union membership. And I assure you it's not through anything illegal that it does, but people are proud to be Teamsters. In fact, people are proud to be Teamsters. This client just organized the casting directors in Hollywood who are now Teamsters and proud of it. How about the lawyers? Oh, do I wish I had a good union. I remember when the ABA was a good union and they used to fix prices and things like that no more. And you and I both would die to have their benefits in this union. That's all I'd like to point out, Your Honor. We didn't reduce the union members' chargeable expenditures at the expense of Mr. Lim. We only reduced their non-chargeable expenditures. But when you weigh what Mr. Lim paid for the services rendered by the union, he didn't pay one penny more than the rest of the union members. And that's why we say they're now interfering in our internal affairs, because we really didn't cause him to pay more than the union members. They want us to make them pay less. Thank you, Your Honor. All right. Thank you. And the matter is submitted. Stick around. We've got some other interesting cases. No charge. Yeah, he'll enjoy this. Only to Your Honor. What? Interesting only to Your Honor. You don't know what you're going to learn here. Sklar v. Commissioner of Internal Revenue.
judges: Pregerson, Wardlaw, Leighton